May it please the court. Jay Nelson on behalf of Avedis Djeredjian in the criminal appeal. With me at council table is Janet Sherman on behalf of Ashken Djeredjian in the forfeiture appeal. Unless the court prefers something different, we've agreed to split our time in half, with me going first. I'll do my best to reserve two minutes for rebuttal. Okay, so do you want to separate out the appeals, do the criminal one, and then do the forfeiture separately? Yeah, I think that would work better for me, if that's agreeable. I think that's what, so we'll do the jury trial on yours, and so you've got ten minutes on that, then we'll hear from the other side on that one, and then when we complete, and then you can reserve your, at eight minutes, sit down, and then we'll go to the forfeiture separately. But you have ten minutes on the forfeiture, and ten minutes on the forfeiture. All right? Sounds good. Okay. Thank you. Thanks. So with the ten minutes I have this morning, I'd like to focus my attention on Mr. Djeredjian's Brady and Napoui claims. And starting first with Brady, there are two pillars of this claim. First is the undisclosed evidence of Kirk Burton's cooperation in Sacramento. The other is the undisclosed scope of Burton's illegal conduct with Daniel Uriah. Now, I think with respect to the first two elements of the Brady test, I don't think there's really much issue there. Well, I don't know that. I mean, certainly that other case where you seem to say because he was a witness that it couldn't have been any, you know, that there was nothing there. Well, I mean, there could be impeachment information there. Well, that's exactly what I'm saying, Your Honor. So are you basically conceding that there was something that should have been disclosed, but it's harmless? No, Your Honor. I must have been inarticulate. My point was I don't think that there's any genuine dispute that both of those, both of the first two elements of the Brady test are satisfied with respect to both the Sacramento evidence as well as the scope of the Uriah trial. The district court said whatever. It's not material because Mr. Burton was so thoroughly impeached by other evidence at trial. Yes, Your Honor. And that's the most fundamental problem with the district court's ruling, and here's why. The government to this very day continues to withhold the actual details of what Burton did in Sacramento. We don't know, well, we know basically three facts about him. We know that Burton was a witness in a wide-reaching investigation that ultimately resulted in the indictment of 20 people. But other than that, we don't know what it is. And so we don't know such facts as what was Burton's role, what was the size of the operation, how many people. What difference does that make? I think what the district court talked about was he had already been, it was the jury knew he had been convicted. He had a felony conviction for the cigarette trafficking. He admitted that he falsified invoices in this white buffalo thing. He admitted on the stand he lied to law enforcement officials, I think, in connection with the Uriah investigation. And so it's how much more can you say somebody is a liar than the evidence that was already on the stand was the district court's view as I understood it. I have two points in response, Your Honor. One is that it's hard to say because we don't know. And so essentially what's happened is the district court said, I don't really know the full details of this, but I know it's not material. And our contention is that's improper. That's inappropriate. And at the bare minimum, this court should ask the government, require the government, to either disclose to it what happened in Sacramento so that it can make an informed materiality decision or to vacate and remand with instructions for the district court to actually find out what happened. Because otherwise, this court would be just deciding the materiality question completely in the dark, which is essentially what the district court did. And the second point. What would make a difference if you're just dreaming up the most favorable evidence that might come out of this additional research? I don't think you put that in your brief. Based on what we know, the very little that we know about what happened in Sacramento, it would actually put quite a different light on Burton. That case apparently resulted in the indictment of 20 people. Now that's just the people who were indicted. We don't know how many people were actually involved. We don't know whether Burton was acting on his own as a very sophisticated informant. We don't know whether he was represented by counsel. And, in fact, the stipulation that was filed in Burton's case in his Nevada case to ask to continue his sentencing, which is what revealed to Mr. Gerigian that Burton was actually involved in the Sacramento cooperation, was filed and prepared by Burton's own lawyer, who didn't seem to know the details of the Sacramento cooperation himself. So that could suggest that Burton was doing this thing on his own, which would represent a much higher and much more sophisticated level of cooperation than the jury had ever heard about Burton. So the district court also, I guess, or the government perhaps, makes the argument that there was so much other evidence against your client. I'm saying your client because I'm still not sure about the pronunciation. But it gets your client to the trial. That Burton, even taking Burton out of the case, would not have made a difference. Well, Your Honor, that's a good segue into Napui. Because, as the court is aware, the Brady and Napui materiality analysis is conducted collectively. So under Jackson v. Well, before you segue, before you segue, can I ask you some Brady questions? Yes, Your Honor. Because as I read your brief, you weren't arguing that what should happen is that we should find out more information about what occurred in Sacramento. You were arguing that the judge erred, the district judge erred, in finding that this didn't meet the Brady test for prejudice. That's right. So focus on that issue for a second. Based on what we know, how does this meet the Brady test for prejudice, which is that it likely would have affected the verdict? Yes, Your Honor. As I was just saying in response to Judge Yakuta's question, there's a lot of things we don't know. But what we do know, which is really what your question was, as I understand it. I'm asking about what you do know. I'm trying to track you. For example, this case ultimately resulted in the indictment of 20 people. Now, what the jury knew about Burton was that he had a very small number of deals with Daniel Uriah to the tune of 4,600 cartons of cigarettes. And it also knew that, as he alleged in our case, he was involved in cigarette transactions with Mr. Gerigian. But that's all it really knew about that. But now the Sacramento cooperation takes it to a new level. He's in a massive ring that resulted in the indictment of 20 people. Who knows how many more were involved on top of the 20 who actually got involved. And so just based on those facts alone, I think there is sufficient evidence for this Court to find that it was material. And really my point with respect to finding more information out at this point was out of minimum. We're going past each other here. Brady requires materiality. I'm agreeing with you for purposes of argument that the government should have let you know all this stuff and it would have been material to the case. My question is, I'm having difficulty figuring out how it would have likely changed the result, which I think is the Brady prejudice test. Is it not? Yes, Your Honor. A reasonable probability. So what we know is this guy is an even bigger wrongdoer than you suspected, involved in many similar transactions of this sort. Why would that change the verdict? Why would that likely change the result? It deeply, deeply tarnishes Burton's credibility. It speaks to his sentencing exposure. It speaks to how deeply indebted he was to the government. But how does it speak to the evidence against your client, which is all separate and apart from Burton as well? Actually, Your Honor, one of the points we've made in our brief is that . . . You've got all the structuring of payments. You've got the various businesses. You've got that empty truck traveling cross-country that just happens to have $273,000. And you have Garagosian, who was his co-defendant and co-conspirator, who was testifying against him. There was an awful lot of evidence there. I'd be happy to address that, Your Honor. And really, if I could, I would like to fold in Napoui, because the materiality analysis really starts with Napoui and proceeds to Brady. So if I could fold in the perjury as well. Under the Napoui standard, assuming the falsity of Burton's testimony and assuming the government knew or should have known about it, the question is whether there's a reasonable likelihood the jury would have returned a different verdict.  had been revealed to the jury or was known to the parties earlier, particularly in conjunction with the Brady evidence, it really would have fundamentally changed the tenor of this trial. I just don't see how this guy Burton's different than any of these people that when you pull them out and they testify, of course, when they're first confronted by the cops, they say nothing. Then as things start looking grim for them, then they start changing their story a little bit, and then they say more. And then they say inconsistent things. And so they're almost hostile witnesses to the prosecution. Does the prosecution, you know, they have to know that they're putting on perjured testimony. And then ultimately at the end, I don't know if Mr. Burton told everything or not, but it's not the same as that you know. This is a different, this is just your typical guy that testifies that tells different stories at different times. That's not the same as putting on knowing perjured testimony. Well, the standard, Your Honor, is not that the government has to suborn perjury to support a Napoui claim. Napoui doesn't just prohibit suborning perjury. Napoui prohibits the presentation of false evidence. And for example, under the case we cited in our brief, Hall v. Department of Corrections, it's clear that the real- All right, what's the false evidence here? Which one's false? False evidence. The one we've highlighted most in our brief and emphasized, that Kirk Burton testified falsely when he testified that he reported his sales of cigarettes to Mr. Gerigian to the Nevada Tax Authority. Did you put those reports in the record? Because I couldn't find them. The reports are not in the record. For some reason, I'm not aware. Then address it. The state of the record, actually, Your Honor, I'm glad you asked the question. The state of the record is ample for the court to resolve the issue in Mr. Gerigian's favor. And here's why. When the tax records came in after trial, March 2009, Mr. Gerigian moved for a new trial. And he said, District Court, I need a new trial. Now, Burton testified that he reported his sales to me to the Nevada Tax Authorities. The sales are not reflected in the tax records. And I don't know why he didn't put them in the record, but he didn't. And by the way, Your Honor, I do have the records here with me. I've prepared supplemental excerpts of record, and if the court would be willing to- Now, I think that we've taken you over your time here, so I'll give you your additional two minutes for rebuttal, but now I'm going to hear from the government. Thank you. Unless either of my colleagues has questions. They don't appear to. All right. Maybe I said differently, but maybe you can put his at ten minutes at this point. Ten minutes? Yeah. Thank you. That would help, since I decided to break them up. Thank you. All right. You can proceed. Good morning, Your Honors. I'm Josh Royster. I'm an AUSA in the Eastern District of North Carolina. I'll be speaking on behalf of the government. AUSA Norman Acker is with me from North Carolina as well. Again, it would just be me. All right. Thank you. Yes. May it please the Court. Thirty-one witnesses testified against the defendant in this case. The overwhelming evidence was that the defendant conspired with others to trafficking contraband cigarettes. Approximately $9.5 million worth of cigarettes were smuggled into the State of California for distribution without payment of the taxes. Your Honors, the bulk of the appeal does deal with Mr. Burton. He was one of the 31 witnesses that testified. He testified that Mr. Jerezian had purchased approximately $2.5 million worth of untaxed cigarettes from him. If it please the Court, I would like to address the Napoui claim first. First of all, the analysis fails right out of the gate, because the defendant has not demonstrated that Mr. Burton's testimony was actually false. So let's talk just for a moment. Well, I think the record demonstrates he's a liar at various points. I think that it is certainly fair. I mean, he doesn't seem to be able to tell us a consistent story, and as you squeeze him the story gets a little bit different. I think that that is fair, and in that way he's not unlike any other co-conspirator, essentially, that testifies at trial. But the standard cannot be that when prior inconsistent statements are made before trial and then the government puts that witness on the stand that that supports a Napoui claim. The tax records here that the Court is talking about, there is information in the record as to what those tax records say. There's also information in the record as to what was actually subpoenaed. The only thing that was subpoenaed were the monthly return filings, and that was what was submitted to the defendant that the government assisted in obtaining. What is the difference between the monthly returns and the statute requires duplicate invoices to be sent? It appears that the statute does say that, that the invoices have to be submitted. But here's an important part of the record that's not included in the defendant's reply brief. In the excerpt of record on page 616, I believe, Burton actually testifies on cross-examination that he did not submit the invoices to the state of Nevada. Now, that may raise an issue about whether Mr. Burton complied with Nevada state law, but it doesn't support a Napoui claim that he gave false testimony because he actually testified that he didn't provide the invoices. All right, Judge Hurwitz has a question. Go ahead. Yes, Judge. I'm much more interested in the Brady claims in this case, and I'd also ask you to address them under Rule 16. Tell me why it was that you think the government didn't have to disclose to the defendant in this case, so they don't mispronounce his name, that a witness at trial was cooperating in another government investigation and was getting something for it. Isn't that just sort of classic, if not Brady, Rule 16 material? Well, Your Honor, that's not entirely what the facts are. Mr. Burton was only a witness. He was not a cooperator in the sense that that term is usually thought of. For example, the way that he was cooperating in the case against Mr. Jerezian and Mr. Array. With respect, aren't you splitting hairs here? Surely, in providing disclosure about a witness, an informant in the case, it would have been useful. I don't know whether it's exculpatory, but it surely would have been useful under Rule 16 for the defendants to know the scope of his cooperation with the government, whether it's formally being called a cooperating witness or not. In your brief, all you say is, well, the events that led to that occurred after the events in this case. That's not particularly a convincing reason. Are you really contending that they had no right to know about this? Well, because he was only a witness, Your Honor. But I don't think Mr. Burton's ever done anything that wasn't in his best interest. I mean, he's not a Mother Teresa witness. Sure, I think that's fair. But here, all the information that we had was that he was a witness. And I will tell the Court, he was never a subject of that investigation. He was never a target. And I personally confirmed, and as an officer of the Court, I will tell the Court, that Mr. Burton was never made any promises in exchange for the information that he provided when he was approached. If all that's true, why didn't you disclose that he was a witness then? We just didn't believe that we had an obligation to disclose him, Your Honor, because he was just a witness. Isn't he a witness because he hangs out with bad people? Isn't that what made him a witness? Well, I think that's certainly part of it. And on any other given day, maybe he wouldn't have been a witness. He would have been a defendant in the case, but you already got him somewhere else. Sure, absolutely. I mean, we believe that we had already provided the Brady material to the defendant. And if I might speak with respect to the materiality component, just kind of moving to that analysis, even if the Court did assume that that information was favorable and that we should have disclosed it, here no Brady violation arises because it is clearly merely cumulative of other significant, hefty impeachment evidence against Mr. Burton. I mean, this man testified on direct examination that he was a convicted felon. He testified that he had lied to investigators when he was initially approached. He testified that he created these false invoices for purposes, essentially, he testified at trial specifically about money, but it was clear he was trying to conceal his relationship with the defendant. Not only is it cumulative of evidence, but the overwhelming evidence established the defendant's guilt aside from Mr. Burton. And, Your Honor, Judge Acuda mentioned the testimony of Macis Garagosian. To the extent that there was a star witness in this case, it was Mr. Garagosian. And, granted, he was not the most articulate co-conspirator that had ever testified. But his testimony was, it established the conspiracy. Mr. Garagosian directed it every step of the way. Yes, sir. I tend, I think, to buy your arguments that this is not reversible error in this case. What concerns me about the government's brief is the sort of notion that, well, we didn't think it would make a big difference, and so we didn't tell them about it. And I think that's not appropriate. I do buy, I do hear your arguments about why this trial almost surely would have turned out the same way anyway. But I am concerned that the government took such a narrow view of its obligations, at least under Rule 16. Well, I'm sorry to say, trust me, we know whether it's, you know, we know how it fits into your defense. And I will tell the Court, the only thing that we knew, and I know that it's broader than just the prosecutors, but the only thing that the prosecutors handling this particular case knew was that Mr. Burton was a witness. We didn't learn anything about the specifics of what that actually meant until more than a month after the trial when the lead AUSA in this case got a telephone call from the lead AUSA in the Sacramento case and said, oh, by the way, Burton's a witness. It wasn't until that point that the two AUSAs even connected the dots. And I certainly understand the Court's point, but again, we believe that it fails on the materiality component. I know I'm running out of time. I just want to speak briefly, if I could, about the search warrant. I think that the most important fact about the search warrant is that the face of the warrant itself says that the affidavit is incorporated by reference. And because of that, the two should be read in a common sense and realistic fashion, not in a hyper-technical manner. And when you look at the affidavit, it's clear that the premises that was to be searched was bargain cigarettes, which was comprised of both the storage facility in the back and the front business. Both of those were under the search warrant. I will tell the Court that we agree that the good faith analysis does not apply here because the issue is the scope of the warrant, and I will tell the Court that. So proceeding under the Hitchcock factors, we believe it's clear that the scope of the warrant included 823.5. Finally, just with respect to the constitutionality of the Act, we believe that this is a clear exercise of Congress's Commerce Clause power and ask that you would find that it's constitutional. All right, thank you. Thank you. All right, Mr. Nelson, you have two minutes. Thank you. I'd like to address the materiality in the aggregate of the Brady and DePuy heirs because that clearly is a point of concern for the Court. The jury clearly believed Kirk Burton rather than Mr. Gerigian at the end of this trial because he rejected Mr. Gerigian's testimony and found a conspiracy. But there are several fundamental problems with that in light of what we know now. First of all, we know that the government would have fundamentally changed its presentation because when the government learned about the tax records, it dropped Burton from sentencing. And there's never been any reasonable explanation for why they did that other than that the government lost confidence in Burton. And I don't think that the government should be able to come in here with a straight face and ask your honors to have confidence in Burton when they dropped him like a hot potato the minute the tax records came in. Second of all, we know Mr. Gerigian's presentation would have changed. If he knew about the DePuy violation, he would have cross-examined Kirk Burton on it. And that would have been devastating evidence of a blatant falsehood under oath in front of the jury. And so the question here is reasonable likelihood, reasonable probability. Would one juror have stood up in the deliberation room and said, you know what, that Burton guy, he lied to my face. And I think, you know, I think Gerigian probably still did it, probably. But I have a reasonable doubt. I have a reasonable doubt because I don't believe Burton because he took the oath and he lied to me, and I don't trust the guy. And that's all that Mr. Gerigian has established at this stage, reasonable likelihood that one juror would have had one reasonable doubt. And that's clearly possible here. Third, your honors, these violations diminish the government's credibility. In the eyes of the jurors, when it puts on a witness, whether they knew about it at that time or not, the government's witness takes the oath and he lies, and the jury learns that. The government's credibility gets diminished, and the jurors reassess all of the government's witnesses, including the other co-operator, Mathis Garagosian, in light of the fact that the government has presented false evidence, whether wittingly or not. Moreover, it increases Mr. Gerigian's credibility. He took the stand, and he gave an extraordinarily plausible, I would submit, explanation to his defense. The jury rejected it. Fine. But the jury didn't have the full assessment of Kirk Burton's credibility against his. So the government repeatedly argued in this case, well, this case is all or nothing. You need to conclude. You're going into overtime. Thank you, your honor. Even if the court believes that the evidence against Mr. Gerigian was strong, that's not dispositive. It's not a Rule 29. The question is whether there's a reasonable likelihood one juror would have raised his or her hand and said, I have a reasonable doubt, and that is certainly possible here. Thank you, your honors. Thank you. All right. That matter is submitted, and now we'll proceed to the forfeiture. Good morning, your honors. Good morning. Janet Sherman on behalf of Ashton Gerigian, and I'd like to reserve three minutes for rebuttal. This is regarding the Greenbrier house, which was a gift to Mom by her son, Vicken, who spent about $400,000 purchasing the house for her. Her son, Avidus, also thought it would be a good idea to give a gift to Mom, and he paid 3% of the price, and Mother took the house and moved into it. Under state law, there's a presumption that a trust is created when a person gives the property to a loved one, and there is no presumption of any resulting trust back to the trustee. The intent of Vicken was to be, is what a resulting trust is about, intent enforcing. And the intent was for Ashton Gerigian to own this home, and she took possession for 12 years, labor, services, maintenance, upkeep, sole dominion and control. It was her home. So there are some California cases saying that an oral trust can be upheld against a third party, even if, like creditors of the trustee. So if we say that the oral trust was, in this case, was valid as a matter of California law, then you're saying that the district court made a mistake, both in saying the oral trust wasn't valid and in saying that there was a resulting trust. Is that correct? Yes. The Haskell case is one of the examples. I'm not exactly certain what page it is. Oh, page 15. We discussed the Haskell case. The woman had a friend that she loved like a daughter, and she gave her the house, and the young woman moved in, and the house was considered ultimately hers against anyone else, because that was the intent. It was notorious. It went on for years. And the elder woman said this was intended to be for my friend Daisy, and Daisy made improvements and took care of the property. So was that a situation, though, where all the money came from ill-gotten illegal behavior? I mean, here, essentially, she's got her two sons that are involved in, and now they're not only unconvicted, they're convicted, and there's no indication that she ever put a dime in it, didn't pay anything for it. Oh, Your Honor, they're taking it as substitute property, not as tainted property. So it's just a question whether it's the property of the defendant. Is that correct? So the only thing forfeitable is the property of the defendant, Evita's, and this is not being substituted as tainted property. This is perfectly clean, and the deacon paid his debt and doesn't owe the government any money anymore. So if the district court held that there was a resulting, that Evita's held a resulting trust, correct, based on the purchased money, not Ashkin, but Evita's, to whom no one ever had an intent. There was never an intent to enforce a trust. There was no trustee. Evita's never said it's my property. Somehow the court found that it was Evita's owned it. But how did the – what was the district court's – how did the district court determine that because Evita's had a resulting trust, let's assume that the district court was correct on that point, that he therefore owned the entire property or that that was all forfeited. So that was all property of the defendant that was forfeitable. The judge never said why he owned all of the property, and indeed there was no basis, and the government argued that he never had to – the judge never has to find that. Now, the law is that only that portion of property that belongs to the defendant is forfeitable. So of course the judge would have to find what portion Evita's owned. And we say at most, all right, he did put in 3 percent of the purchase price, but how could he own all of the property? And the government never said – it always used words like find some portion, an interest, a forfeitable interest. The government never said he owned the property. They always said, well, he owned something, some portion of the property. We say he didn't own any portion because it wasn't any intent for him to do that, and there's a presumption that if it's to a loved one, there is no resulting trust back to the person who gives it to the loved one. Well, didn't the district court say that the transfer of a life estate to your client pursuant to an oral trust failed under the statute of frauds? It did, but then it said Evita's didn't. So Ashkin's failed under the statute of frauds where there was plenty of evidence. So let me ask you a question about that because I'm a little bit confused about the procedural history. Your client – if your client has no interest in the property, which is what the district court found. Correct. What's your problem? Well, the district court was wrong. Well, okay, but why was the district court wrong? She had a resulting trust. She had an oral agreement. We showed that an oral agreement. But the district court said – yeah, that's my question. The district court said that oral agreement was not enforceable because of the statute of frauds. Correct? Well, the court was wrong because a resulting trust takes the property out of the statute of frauds, and she did have a resulting trust, more so than Evita's might ever have, because she was the one that all the people intended to have the house. No one ever intended a resulting trust. Now, the court found that Evita's had a resulting trust, but there was no trustee. There was no intent. There was no – there's a presumption against him taking it because it was to a loved one. Let me try this slightly differently. Let me try this slightly differently. Assume that Evita's didn't have a resulting trust for the moment. Then he did not have any interest in this property. And so it was not a property of the defendant for purposes – That was the basis of the court's finding, that he had a resulting trust. Right. But that's different than finding that your client had no interest in the property, isn't it? Well, it's – In other words, if my property were forfeited in this case, you'd have no complaint. I'm sorry? I'm sorry, I didn't – He said if his property was forfeited, hypothetically, if his property was forfeited in this complaint, you would have – you wouldn't have any basis to complain about it. I myself? Right. Because you would have no interest. Your client. But I do have an interest. I've possessed it for 12 years. So it's a question of – Possession gives me sufficient standing, and I am the one for whom the property was purchased. I'm the one who gave my labor services and relied upon that to live in this property, take care of it. Let me just back you up for a moment. So, I mean, what we have before us is a question, at least initially, a question of California law as to whether your client has an interest in the property. And you've suggested a range of theories, and there are some cases supporting an oral trust. If she doesn't have any interest as a matter of California law, then you have no standing to come in here and argue for her. In forfeiture cases, property rights are determined under California law. Okay. So if she doesn't, if it's just as a matter of California law, your client has no interest in the property, then we would just say you have no standing under 853 N2, and you're out. My possessory interest is sufficient. So the real question is whether under California law your client has an interest in the property. Is that correct? Whether she has a resulting trust. Or any interest. It doesn't have to be a resulting trust, correct? The same with Avitis. All interests are determined under state law, whether the person has a property right. Thank you. But you don't represent Avitis. I don't represent Avitis. I represent Avitis. So answer Judge Ikuda's question. Answer Judge Ikuda's question, which is the one I inartfully tried to ask, which is why is it that under California law, why is it that the judge was wrong in concluding under California law that your client didn't have an interest in the property? Because we showed that she satisfied the criteria for an oral trust, the resulting trust, and an equitable ownership in the property. And we say that also the court never found what interest Avitis had in the property. I think the court, if only the defendant's property is forfeitable, portion of property is forfeitable, then under Federal law, then only that portion is forfeitable and has to be determined. I know the government said that it does not have to be determined, but clearly Avitis did not own 100 percent of this property. And clearly Ashkin did own the property, based upon all of the factors that I discussed earlier. And all of the cases cited in our brief, I would suggest in the reply brief, we list four or five other cases that are pretty clear on these points. And we also argued that a summary judgment wasn't appropriate because there are still genuine issues of fact that could be resolved. Your time has expired. I'll give you a minute for rebuttal. Thank you so much. Your Honors, thank you. This issue was resolved. Say your name again, just since we're handling it separately. Sure. Josh Royster, again, I'm an AUSA in the Eastern District of North Carolina, and I represent the United States, the appellee. This case was resolved at summary judgment, and so that is the issue that was before this court, DeNovo, where the district court essentially got it right. This was a substitute asset. It was property of the defendant, and Ms. Derejian did not have a legal interest under the statute, under California law. Let me just stop you for a moment. There are some cases saying that an oral trust is enforceable against third parties like creditors. The cases you cited were all where the trustee says, I don't have a trustee, it was a gift. And there they said, no, the beneficiary doesn't have any right. But where the trustee and the beneficiary agree, as in this case, the California courts have upheld it against third-party creditors of the trustee, for example. So if Ashkin had a legal interest or had that oral trust interest in the property, then how do you analyze it from there, if you can start with that assumption? If I started from the assumption that she did have interest by waiver. That the district court was wrong in saying she had no interest. Sure. Well, then the analysis would proceed under 853 N6 as to whether that interest is forfeitable. And so the first part is whether her interest was superior to Avetis'. So she has an interest in the property. The court says that Avetis' has a resulting trust, but never defines how much of the property Avetis' might have an interest in. What do we do with that? There doesn't seem to be any basis to say that Avetis' owns the whole property. Well, there may be. And what would that basis be? He's contributed $16,000. Everyone agrees that the property is being held in trust for the mother. Sure. That is the information that's before the court, apparently, that Avetis' only contributed 3.5%. The fact of the matter is we don't truly know the entire amount of what Avetis' provided and Vickin provided. That's the information that was presented. The magistrate court never made that determination. I'm sorry. This is a summary judgment. This is a summary judgment. We don't truly know is not a great way to support it. Well, I mean, the fact, all I mean is whatever information we have, it wouldn't change the ability of the court to enter summary judgment, how much money Avetis put in above the 3.5%. But what we know is that his interest that he does claim in his declaration is that he's a one-half, at least a one-half undivided interest. He said he had a future interest under some contingencies. So are you basing it on that? Well, partly. Because the district court, I guess what concerns me is we've said in Lester that only the property of the defendant is profitable under the substitute property statute. And the district court never identified or determined what the property of the defendant was. I think that the court only has to determine that the defendant has an interest in the property. Well, there's a big difference between having an interest in the property and it being the whole property being the property of the defendant. Well, the next part of the analysis, and I know that you've asked me to assume that Ms. Jerezian has an interest. Sure. No one else filed a legally valid claim to the property. And there are two things, really, that the court should look at. One, Evita's statement that he owns at least a one-half undivided interest and the only other person is with his wife. That's his own admission. But all the other evidence was. . . Did he say a one-half undivided interest? I thought it was just a future interest if his children were minors when the mother expired. It's actually in his declaration that was submitted in response to the government's motion for summary judgment was that he had a one-half undivided interest. At one point. . . Where is that? That's going to be in excerpt of record pages 132 to 133, Your Honor. And that's precisely what, how he describes his interest. But didn't the district court here, in response to her claim, which is why we're here. . . If nobody else had made a claim against the property, we wouldn't have a problem. She claimed that she had an interest, the appellant in this case. She did, yes, sir. I don't want to mess up the names. The appellant in the forfeiture case. So why was, and as Judge Okuda pointed out, there are cases that say a resulting trust can be an interest in the property. So why was this appropriate for summary judgment? I can understand if the judge heard everybody and said, I don't buy this. There never was a trust at all. But why was it appropriate for summary judgment given her position in her declaration? Because there wasn't any evidence to support this purported intent to give the property as a gift. You have to analyze it under the statute of frauds like the district court did. You first look to see where there was a writing and there was not. And then secondly, whether the interest in a . . . But all the testimony that I saw, except I guess I didn't look at this ER 132 to 133, but in Evita's discussion with the magistrate judge and all the other testimony, seemed like everyone agreed that it was being held in trust for the mom with a future, contingent future interest. That was the purported intent. But again, you have to look at what the underlying evidence was, Your Honor. And here, you had two sons who paid part of the . . . Well, I guess what they're saying is, why don't you have a trial on that and then find out who's telling the truth? Why is this a matter of law? Because there was no objective evidence that was submitted to the district court. There were three opportunities to do that. The first was in her declaration. There's no information that she ever provided any money towards the property or that there's any evidence that would give rise to this resulting trust. The second was her answers to her interrogatories. No evidence about any improvements to the property or things like that that would give rise to a resulting trust. So the title holder and the beneficiary and the two people who put up money all agree with how the property is held and that she has an interest. It seems like there's plenty of evidence to suggest she has an interest. So I'm confused about your statement, there's no evidence. There's no evidence that Evita's had an interest at all because everybody agrees that he didn't. So that seems to be less. There seems to be less evidence as to that. Not everybody agrees he didn't have an interest. The district court and the government agreed that he had an interest. Absolutely, and that arose by way of resulting trust. Well, that's the best description for it. Again, looking at his declaration, he admits that he maintained an interest in the property. The other point is there was never a legally valid transfer of this property to the appellant, which would be objective evidence that would support this purported intent. Well, the question is, do you have to weigh the evidence to get there, or can it be on summary judgment? It can be on summary judgment. Again, there was never any objective evidence that the court could consider at summary judgment as to whether there was an interest that arose by way of operation of law. The analysis proceeds under California's statute of frauds. One, there's no writing, and then two, one, there's no dispute that an oral trust can arise. I'm sorry. Yes, sir. That's my question. If an oral trust can arise, then the statute of frauds disposes of the question of whether there was a deed of transfer, if you will. But an oral trust will always by necessity involve something outside the statute of frauds, won't it? Sure. Well, that's the exception to the statute of frauds is that it can arise. Of course. In this case, the appellant says, we had a deal, me and my son. I was going to have this property during my life except if certain contingencies happened. He says to have said the same thing at least at some point, although not, I think, in response, you say, to the forfeiture complaint. So why isn't that enough to create a question of fact about an oral trust? There was no evidence of this oral agreement. With respect to the reply brief, there are really two different theories that are kind of. How can you say there was no evidence? There was no written evidence. Everyone testified the same. Their declarations, correct. Darian testified the same. Ashkin testified the same. Avedis testified the same. Vicken testified the same. So everyone agreed as to what the structure was. So how can you say there's no evidence? What I'm saying is there was no evidence that a resulting trust was intended. To answer your question. I'm sorry. Maybe I'm just not understanding it. Well, I think what you're saying is there's no evidence you believed or that the judge believed. But does that mean that there's really no evidence if people, you know. I mean, admittedly, there's reasons that someone might find the people involved not credible. But the question is when you say there's no evidence, if those affidavits are part of the record and on summary judgment you don't make a credibility finding, is there evidence? I guess what I'm saying is that these are conclusory statements that are made that are not supported by any factual information in the record. And that cannot defeat summary judgment. Ultimately, that's the point that I'm trying to make, is that those are conclusory statements not supported by factual information. Okay. Thank you. I think we'd ask that you affirm that that court's ruling. All right. I gave the, I believe, the appellant one additional minute. Your Honors, I agree with the court's comments and that summary judgment was not the proper way to go in this case. I think the court made a little stronger argument than you did. Well, I mean, that's what, that's, you know, that it's helpful if you would make that stronger argument to the court instead of the court making it to you. Yes. Respond, if you would, to the government's last point, that there was no real evidence of a resulting trust. There were just conclusory statements that there was a resulting trust. What's the evidence? This was summary judgment, and the court never held a hearing in this case. We never had one hearing at all. What admissible evidence was there that there was a resulting trust? All of the declarations of the various parties. All of the declarations. Did they state facts that would have given rise to a resulting trust, or did they just say it was a resulting trust? It was clear that Ashkin had a resulting trust. It was clear that Avitis had no interest in this property. And it was clear that the judge didn't find, didn't find, when he said he had a resulting trust, he didn't find it based upon anything that anyone had submitted. Well, let me help you out here. If you wanted to say why this isn't conclusory, you would say things like her affidavit said that she actually lived in the house for X number of years and all of that. Absolutely. As opposed to if someone said, I have a resulting trust, but they didn't add any facts that they had actually lived there or something along those lines, then that would be, if I said I had a resulting trust in a house I never lived in, that might be conclusory. No, it wasn't conclusory. There were specific facts in the declaration, and they're in the record. All right. Very specific. Thank you. This matter will be submitted.
judges: Callahan, Ikuta, Hurwitz